JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division
SETH M. BARSKY, Chief
MEREDITH FLAX, Assistant Chief
SHAMPA A. PANDA
Trial Attorney
Wildlife and Marine Resources Section
150 M Street NE
Washington, D.C. 20002
Tel: (202) 305-0431
Fax: (202) 305-0275
shampa.panda@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 2:20-cv-3657-BHH |
| | ) | |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | **FEDERAL DEFENDANTS'** |
| | ) | **CORRECTED MOTION TO DISMISS** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## INTRODUCTION

The Court should dismiss Plaintiff's claims alleging violations of the Endangered

Species Act, Migratory Bird Treaty Act, and National Wildlife Refuge System Administration

Act because the State of South Carolina, not the U.S. Fish and Wildlife Service ("Service"), that

authorizes the taking of shellfish, finfish, and other saltwater species within the Cape Romain

National Wildlife Refuge ("Refuge") boundary, including horseshoe crabs. Thus, to the extent

illegal harvesting of horseshoe crabs within the Refuge is harming migratory shore birds, it is not

due to any authorization by the Service. Additionally, the Service has not taken any final agency

action that authorizes the commercial harvest of horseshoe crabs on the Refuge. Plaintiff's

discontent with the allowance of horseshoe crab harvests on the Refuge should lie with the State,

not the Service.

## FACTUAL BACKGROUND

### I.    Overview of Cape Romain National Wildlife Refuge

The Refuge is a unit of the National Wildlife Refuge system, established in 1932 as a

migratory bird refuge covering a twenty-two mile segment along the South Carolina coast. Cape

Romain National Wildlife Refuge 2010 Comprehensive Conservation Plan ("CCP"), Compl. Ex.

B (ECF No. 1-2). The Refuge is comprised of approximately 66,000 acres. *Id.*

In 1991, the United States government and the State of South Carolina entered into an

exchange agreement Lease, whereby the Federal government quitclaimed 4.27 acres of land to

the Town of McClellanville in exchange for a 99-year lease of all submerged lands inside the

boundaries of the Refuge. Compl. Ex. A (ECF No. 1-1). South Carolina transferred

> All of the State of South Carolina's interest in all marsh lands, sand banks, shores,
> edges lands uncovered by water at low tide, and all waterbottoms and waters
> which are included within the boundaries of the Cape Romain National Wildlife
> Refuge, or which are contiguous and adjacent to the easterly boundary and
> fronting on the Atlantic Ocean to mean low tide, containing 31,000 acres, more or
> less, all located in Charleston County, South Carolina . . . .
>
> Subject to … **The right of the State of South Carolina to authorize the taking
> of shellfish, finfish, and other salt water species within the refuge boundary.**

*Id.* (emphasis added). Under this reservation, the authorization of harvests from fisheries within

the boundaries of the Refuge, including the harvest of horseshoe crabs, are the jurisdiction of the

State of South Carolina. Compl. Ex. D (ECF 1-4), 1.

II.    **Commercial Horseshoe Crab Harvesting on the Refuge**

The South Carolina Department of Natural Resources issues permits authorizing the commercial harvest of horseshoe crabs on the Refuge, specifically within Bulls Bay.  ECF 1-4, 1; *see* S.C. Code Sec. 50-5-1330 (Horseshoe Crab Hand Harvest Permit).  Bulls Bay is approximately 25,580 acres of open water stretching from Bulls Island on the South and Raccoon Key Island on the North.  *Id.* at 2.  There are five island in this bay, and approximately twelve miles of shell rakes that surround the bay on the west side.  *Id.* at 3.  The horseshoe crab harvest occurs during the evening high full moon or new moon tides while they are spawning in April – June.  *Id.*.  The harvesters collect the horseshoe crabs by walking in the intertidal zone and picking them up and putting them in a boat.  *Id.*

The Service closes Marsh Island, White Banks, and Sandy Point annually to boat landings from February 15 to September 15, and has been doing so since 2003 due to their importance to nesting, roosting, and foraging seabirds and shorebirds.  *Id.*, *see also* 50 C.F.R. §26.34(mm)(1)(v); ECF No. 1-2, 157, 159 (Compatibility Determinations for Beach Use and Surf Fishing).  The South Carolina Horseshoe Crab Hand Harvest Permit issued by the State specifically does *not* allow "harvest in restricted areas designated by other entities of the State or Federal government." *Id.* at 4.  Thus, horseshoe crab harvesting is not allowed on Marsh Island, White Banks, and Sandy Point during the closure period.

On May 12, 2012, the Refuge Manager issued a letter to Mr. Joel Munn, the holder of a State-issued Horseshoe Crab Hand Harvest Permit, notifying him that the collection of horseshoe crabs on Marsh Island and White Banks is illegal, because of the closure of these islands to protect nesting shorebirds, and not authorized under his permit with the State.  Compl. Ex. F (ECF No. 1-6) (2012 Letter).

On May 15, 2014, the Service issued a Special Use Permit to Mr. Munn to access the

Garris Landing boat launch during horseshoe crab harvest season during closed hours.  ECF No.

1-9 (2014 Permit).  The permit specifies that the permitee will not access closed areas of the

Refuge.  *Id.* at 9.

On April 19, 2016, the Refuge Manager issued another letter to Mr. Munn reiterating that

certain areas of the Refuge are closed for protection of shorebirds, and therefore not open for the

harvesting of horseshoe crabs under his permit with the State.  Compl. Ex. E (2016 Letter).

## STATUTORY AND REGULATORY BACKGROUND

### I.    Administrative Procedure Act

The APA identifies who may challenge agency action and what actions may be

challenged.  Section 702 provides a cause of action for those suffering actual injury as a result of

a final agency action.  5 U.S.C. § 702.  "Final agency action" forms the basis of a court challenge

and provides the court the authority to review the case under the APA.  5 U.S.C. § 704 ("Agency

action made reviewable by statute and *final agency action for which there is no other adequate*

*remedy in a court* are subject to judicial review.") (emphasis added).  An agency action is

considered "final" where it marks the consummation of the agency's decisionmaking process and

is an action from which "legal consequences will flow" or "rights or obligations have been

determined."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Under the APA, the court may

"hold unlawful and set aside" final agency action that it finds to be "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The APA also provides for a court to "compel agency action unlawfully withheld or

unreasonably delayed."  5 U.S.C. § 706(1); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55,

61–62 (2004). A plaintiff may thus bring suit to "compel agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. §§ 706(1). Section 706(1) "empowers a court only to compel

an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter,

without directing how it shall act.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)

(quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). A

"failure to act" is merely "a failure to take one of the agency actions (including their equivalents)

earlier defined in § 551(13)." *Id.* at 62. "All of those categories involve circumscribed, discrete

agency actions, as their definitions make clear." *Id.*; *see* 5 U.S.C. §§ 551(4) (defining "rule"),

(6) ("order") (8) ("license"), 10 ("sanction"), (11) ("relief").

In addition, "the only agency action that can be compelled under the APA is action

legally required." *Id.* at 63. "Thus, a claim under § 706(1) can proceed only where a plaintiff

asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64.

## II.     Endangered Species Act ("ESA")

The ESA provides for the listing of species[1] as threatened or endangered, 16 U.S.C. §

1533, and the ESA protects listed species in several ways. As pertinent here, Section 7(a)(2)

directs each federal agency to ensure, in consultation with the U.S. Fish and Wildlife Service or

the National Marine Fisheries Service, that discretionary actions do not "jeopardize the

continued existence of" any listed species or destroy or adversely modify designated critical

habitat. *Id*. § 1536(a)(2). The ESA's regulations define "agency action" to include "all activities

or programs of any kind authorized, funded, or carried out . . . by Federal agencies in the United

States." 50 C.F.R. § 402.02.

If the agency proposing the action determines that the action "may affect" listed species

---

[1] The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16)

or critical habitat, the action agency must pursue either informal or formal consultation with the consulting agency.  50 C.F.R. §§ 402.13- 402.14.  If formal consultation is required, the consulting agency must prepare a biological opinion, setting forth its expert opinion on whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.  To "jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

If the Service issues a "no jeopardy" opinion, but determines that the action may incidentally take[2] members of a listed species, the agency will include an Incidental Take Statement ("ITS") in the biological opinion specifying the amount or extent of anticipated take, reasonable and prudent measures to minimize the impact of the take, and mandatory terms and conditions to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). Any take in compliance with the terms and conditions of the ITS is exempt from ESA Section 9's take prohibition. *Id*. § 1536(o)(2). If the amount or extent of take specified in the ITS is exceeded during the project, Section 7 consultation must be reinitiated. 50 C.F.R. § 402.16(a).

### III.     Migratory Bird Treaty Act ("MBTA")

The MBTA makes it unlawful to "pursue, hunt, take, capture, kill, attempt to take, capture, or kill" any migratory birds native to the United States, as well as their nests and eggs, "[u]nless and except as permitted by regulations." 16 U.S.C. § 703(a); 50 C.F.R. § 10.1.

---

[2]     Unless exempted, Section 9 prohibits any person, including a federal agency, from "taking" members of a listed species. 16 U.S.C. § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Id. § 1532(19).

Originally enacted in 1918 to implement the Convention between the United States and Great Britain for the Protection of Migratory Birds, U.S.-Gr. Brit., Aug. 16, 1916, 39 Stat. 1702, the Act has since been amended to implement similar Conventions concluded with Mexico, Japan, and the Soviet Union. *See* 16 U.S.C. §§ 703, 704(a); *United States v. Brandt*, 717 F.2d 955, 956 (6th Cir. 1983); *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 875 (D.C. Cir. 2006). The Service implements the MBTA on behalf of the Secretary.

Most relevant here is the Act's prohibition against "take," which the MBTA's implementing regulations define as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect," or to attempt such conduct. 50 C.F.R. § 10.12. The Service may issue permits for take where "compatible with the terms of the conventions," and has promulgated regulations for take permits in falconry, scientific collecting, conservation education, taxidermy, and hunting of migratory waterfowl. 16 U.S.C. § 704(a). *See also* 50 C.F.R. Part 21.

## IV.    The National Wildlife Refuge System Administration Act

The System includes over 568 refuges and more than 855 million acres of protected land, divided into eight geographic regions. *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011). The Department of the Interior delegates to the Service authority to manage these properties pursuant to the National Wildlife Refuge System Administration Act, as amended by the National Wildlife Refuge System Improvement Act ("Refuge Act") codified at 16 U.S.C. §§ 668dd–668ee. The mission of the System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id*. § 668dd(a)(2). Each particular refuge also has a purpose or purposes. *Id*. § 668dd(a)(3)(A). In administering the System, the Service is to "ensure that

7

the biological integrity, diversity, and environmental health of the System are maintained." *Id*. §
668dd(a)(4)(B).  The Service must also "ensure effective coordination, interaction, and
cooperation with owners of land adjoining refuges and fish and wildlife agency of the States in
which the units of the System are located." *Id*. § 668dd(a)(4)(E).  Should a conflict arise
between a refuge's purpose and the System's mission, the Service must resolve conflicts "in a
manner that first protects the purposes of the refuge, and, to the extent practicable, that also
achieves the mission of the System." *Id*. § 668dd(a)(4)(D).

The Service manages the System by issuing comprehensive conservation plans for each
refuge. *Id*. § 668dd(e).  Those plans are updated every 15 years. *Id*. § 668dd(e)(1)(A)(iv).
During the comprehensive conservation planning stage, the Service identifies the purposes of the
specific refuge and makes and revises determinations that a refuge use is compatible with those
purposes ("Compatibility Determination"). *Id* § 668dd(e).; *see also Id*. §§ 668dd(d)(1)(A), (B)
and (d)(3)(A)(i).  Except under limited circumstances, "the Secretary shall not initiate or permit a
new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary
has determined that the use is a compatible use and that the use is not inconsistent with public
safety." *Id* § 668dd(d)(3)(A)(i).

## STANDARD OF REVIEW

The Federal Defendants move to dismiss the Complaint under Federal Rule of Civil
Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim upon which
relief can be granted.

Jurisdiction is a threshold question and must be addressed before a court reaches the
merits of a case. *Steel Co. v. Citizens for a Better Env' t*, 523 U.S. 83, 88– 89 (1998).  Once
challenged, the party seeking to invoke the court's jurisdiction holds the burden to demonstrate

that jurisdiction exists. *See Evans v. B.F. Perkins Co., a Div. of Standex Int' l Corp., 166 F.3d 642, 647* (4th Cir. 1999). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Rule 12(b)(1) motions can be either " facial" or " factual" challenges. In a facial challenge— as our standing and ripeness arguments are— the court takes as true the facts alleged in the complaint and determines whether those facts are sufficient to invoke the court' s jurisdiction. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). The court, however, should not take as true legal conclusions disguised as factual allegations. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). In a factual challenge— as our mootness argument is— the court may consider evidence outside the complaint for purposes of assessing its own jurisdiction. *See Kerns*, 585 F.3d at 192.

To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court "must take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and to satisfy the court that the claim is "plausible on its face." *Twombly*, 550 U.S. at 555, 570 . A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"—a standard that requires more than facts "that are 'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 556-57).

The complaint must "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  Although all well-pled allegations are presumed to be true and are viewed in the light most favorable to the plaintiff, *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Similarly, a court need not accept as true a plaintiff's "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000), or "a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Plaintiff's ESA Claims (Fourth through Sixth Claims for Relief)

Plaintiff relies on the ESA's jurisdictional provisions regarding citizen suits to assert that the district court has jurisdiction over their ESA claims. In relevant part, the ESA allows any person, including entities, to:

> commence a civil suit on his own behalf ... to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof....

16 U.S.C. § 1540(g)(1)(A).

The ESA citizen suit provision also states, "The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty...." 16 U.S.C. § 1540(g)(1).  As discussed below, because the Service does not authorize horseshoe crab

harvesting in the Refuge it has no ESA Section 7 duty in connection with such harvesting and thus the court does not have jurisdiction over Plaintiff's ESA claims alleging violations of ESA Section 7.

### A.    Plaintiff Alleges No Federal Action to Trigger Section 7 Consultation Requirements

Section 7(a)(2) requires "[e]ach federal agency . . . in consultation with and with the assistance of" the Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Plaintiff has alleged no affirmative federal action that triggers an obligation by the Service to undertake Section 7 consultation.

### 1.    There is no federal action that requires consultation

Plaintiff alleges that the Service has violated the ESA by failing to consult on horseshoe crab harvesting authorizations.  But the Service does not authorize horseshoe crab harvesting, South Carolina does. And the only actions Plaintiff alleges the Service has taken do not constitute "action" triggering a duty to engage in ESA Section 7(a)(2) consultation.

Plaintiff's claim that the Service failed to initiate consultation on horseshoe crab harvesting authorization. Comp. ¶¶ 151-155 (Fourth Claim for Relief). But the horseshoe crab harvesting permits that actually authorize and facilitate the horseshoe crab harvesting are issued by the South Carolina Department of Natural Resources, not the Service.  ECF No. 1, Ex. 4 at 5. Thus, Plaintiff's claim fails because the Section 7(a)(2) consultation requirement applies only to actions authorized, funded, or carried out by *federal* agencies.  *See* 16 U.S.C. § 1536(a)(2) ("Each *Federal* agency shall …"); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 653, (2007) (the ESA's § 7(a)(2) consultation requirement "does not apply to permitting decisions by state authorities"); *Wild Equity Inst. v. United States Envtl. Prot.*

*Agency*, 147 F. Supp. 3d 853, 866 (N.D. Cal. 2015), *aff'd sub nom. Wild Equity Inst. v. U.S. Envtl. Prot. Agency*, 696 F. App'x 843 (9th Cir. 2017) (finding no 7(a)(2) consultation requirement where the issuance of the complained-of permit was issued by state agency).

In Plaintiff's own exhibits attached to the complaint, Refuge manager Sarah Dawsey makes clear that "[k]nowing that the [horseshoe crab] harvest regulations were the jurisdiction of the [South Carolina Department of Natural Resources]" she went to the state agency to discuss "harvesting taking place on the most sensitive area of the refuge." ECF No. 1, Ex. 4 at 3. She goes on to state that she met with South Carolina Department of Natural Resources employees in August 2013 and "discussed the Bulls Bay permit and the best course of action to address illegal entry and harvest on closed islands," and "asked [the South Carolina Department of Natural Resources] for assistance in taking Marsh Island out of the harvesting permit area." ECF No. 1, Ex. 4 at 4. She then met with the director of Marine Resources for the South Carolina Department of Natural Resources to "verify horseshoe crab permit regulations in the Bulls Bay area and again ask for help in addressing the conflict in regulations, and express the importance of this island to nesting birds," who responded by sending her the permit that the South Carolina Department of Natural Resources had issued to Munn. *Id.* at 5. The permit does not authorize Munn to collect in "restricted areas designated by other entities of the State or Federal government" such as Marsh Island and White Banks. *Id.* at 5. All of these are actions that Dawsey took to inform the South Carolina Department of Natural Resources—the state agency that authorizes horseshoe crab harvesting—of the violation of the permit that it had issued. But they do not constitute *federal* action that triggers Section 7(a)(2)'s consultation requirement. Certainly, the Service is not also required to consult on its day-to-day management of the Refuge, since such a requirement would be effectively never-ending. *See Forest Guardians v.*

*Forsgren*, 478 F.3d 1149, 1159 (10th Cir. 2007).

### 2.    There is no affirmative agency action

The only actions Plaintiff alleges the Service (as opposed to South Carolina) has taken
are (1) issuing a 2014 Special Use Permit to Munn to allow him use of a boat launch in the
Refuge, Compl. ¶ 97 (ECF No. 1, Ex. 5), and (2) issuing a 2016 letter to Munn stating that Marsh
Island, White Banks, and Sandy Point are closed from February 15 through September 15,
Compl. ¶ 96.  But these actions do not constitute agency "action" that "may affect" ESA-listed
species and thus do not trigger the ESA's consultation requirement.

Section 7(a)(2) requires consultation only for affirmative agency "actions," defined as
"activities or programs of any kind *authorized, funded, or carried out*, in whole or in part, by
Federal agencies." 50 C.F.R. § 402.02 (emphasis added); 16 U.S.C. § 1536(a)(2).  The language
in the horseshoe crab harvesting permit issued by the South Carolina Department of Natural
Resources makes clear that permitees may not collect horseshoe crabs in "restricted areas
designated by other entities of the State or Federal government," ECF No. 1, Ex. 4 at 5, making
clear that harvesters cannot collect in areas such as Marsh Island and White Banks.  It is South
Carolina's job to enforce its permits, not the Service's.  And even if the Service could also
enforce these rules any lack of enforcement by the Service of this language in the permit does
not constitute agency "action."

In *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012), 681
F.3d at 1021, the Ninth Circuit sitting en banc made clear that an ESA claim accrues only when
an agency takes discretionary, affirmative action, holding that "'inaction' is not 'action' for [16
U.S.C.] Section [1536](a)(2) purposes."  Accordingly, Section 7(a)(2) does not apply to actions
*not* authorized, funded, or carried out—like *not* monitoring areas of Cape Romain such as Marsh

Island and White Banks to ensure that harvesters do not harvest on these sensitive areas of the Refuge. *See W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006) ("The language does indicate that some agency actions are not covered—those the agency does *not* authorize, fund, or carry out." (citation omitted)). Plaintiff tries to cast these inactions as actions, by alleging that the Service "communicated" with Mr. Munn "knowing that he has repeatedly harvested horseshoe crabs on Marsh Island after the Service informed him that he was prohibited from doing so," and that the Service's "2016 authorization, therefore facilitated [Munn's] continued use of Marsh Island and other areas in Cape Romain for horseshoe crab harvesting." Compl. ¶ 96.  But this logic would qualify every agency decision not to act as an affirmative action subject to Section 7(a)(2) consultation. The meaning of "action" does not stretch this far. *See Matejko*, 468 F.3d at 1108 ("Although the term 'agency action' is to be construed broadly . . . section 7(a)(2) consultation stems only from 'affirmative actions.'"); *Cal. Sportfishing Prot. All. v. F.E.R.C.*, 472 F.3d 593, 598 (9th Cir. 2006) (a private party's ongoing operation of a hydropower project, pursuant to an earlier approved permit, was not an affirmative act by the federal agency); *Ctr. for Biological Diversity v. Envtl. Prot. Agency*, 847 F.3d 1075, 1090 (9th Cir. 2017) (finding that Environmental Protection Agency's pesticide registration program did not constitute ongoing agency action that trigger duty to comply with the ESA); *Int'l Ctr. For Tech. Assessment v. Thompson,* 421 F. Supp. 2d 1, 9 (D.D.C. 2006) (finding that Food and Drug Administration "did not engage in an 'agency action' triggering ESA compliance" because "the plaintiffs mischaracterized the FDA's refusal to engage in enforcement activity as an affirmative action").

Plaintiff's vague allegations of the Service's discretionary control over Cape Romain, as evidenced by the issuance of a Special Use Permit "[i]n 2014 and at least one subsequent year"

to Mr. Munn for after-hours use of a boat launch within the refuge, Compl. ¶ 97, are insufficient

to trigger the Service's consultation requirement.[3] *Compare with Nat'l Wildlife Fed'n v. Nat'l*

*Marine Fisheries Serv.*, 524 F.3d 917, 923 (9th Cir. 2008) (The Army Corps of Engineers'

hydropower operations at federal dams on the Columbia River constitute an agency action under

Section 7 of the ESA); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340

F.3d 969, 975 (9th Cir. 2003) (agency's continued issuance of fishing permits that currently

governed the challenged fishing vessels' activities constituted agency action); *Nat. Res. Def.*

*Council v. Jewell*, 749 F.3d 776, 781 (9th Cir. 2014) (agency retained "some discretion" in

renewal of long-term water delivery contracts that were in effect at the time of the challenge and

were governing water delivery operations).  The consultation duty is triggered only when the

Service affirmatively exercises that discretion to act.  *Ctr. for Biological Diversity v. Envtl. Prot.*

*Agency*, 65 F.Supp.3d 742, 758 (N.D. Cal. 2014) (overturned on other grounds by *Ctr. for*

*Biological Diversity v. Envtl. Prot. Agency*, 847 F.3d 1075, 1090 (9th Cir. 2017).  Not, as

Plaintiff contends, to fail to enforce horseshoe crab harvesting within the Refuge.

     At bottom, ESA Section 7(a)(2) speaks in terms of affirmative agency actions.  The mere

existence of unexercised authority to take additional action is insufficient to trigger the duty to

engage in ESA consultation.  *Ellis v. Bradbury*, 2014 WL 1569271, at \*12 (N.D. Cal. Apr. 18,

2014) ("[E]ven where an agency has discretion to change the terms of an existing license, the

agency has no duty to consult in light of such retention of discretion, when it has not exercised

such discretion.").  Because Plaintiff has identified no specific affirmative act by the Service that

---

[3] To the extent that Plaintiff is attempting to allege that horseshoe crab harvesting that results
from the Service's 2014 Special Use Permit granted to Mr. Munn is an agency action, the
caselaw is clear that the subsequent effect of a prior agency action is not itself an "agency
action" that triggers ESA § 7 consultation. *See Karuk Tribe*, 681 F.3d at 1021; *Cal. Sportfishing
Prot. Alliance*, 472 F.3d at 597–98.

would trigger Section 7 consultation, this Court lacks jurisdiction.

Additionally, and alternatively, even if the Court finds that the special use permit or the

letter is an "action" because it is an activity authorized by the Service, it does not trigger Section

7 because it does not have an effect on listed species. The relevant provision of the regulation

states that:

> "Effects of the action are all consequences to listed species or critical habitat that
> are caused by the proposed action, including the consequences of other activities
> that are caused by the proposed action. A consequence is caused by the proposed
> action if it would not occur **but for** the proposed action and **it is reasonably certain**
> to occur."

50 CFR 402.02 (emphasis added). Mr. Munn's illegal harvesting cannot be said to occur but for

the issuance of the special use permit—or letter—since he can still access these areas without the

permit. And the Service did not have a reasonable certainty that illegal harvesting would occur.

**B.    Plaintiff's ESA Reinitiation Claim Fails to State a Claim (Fifth Claim for Relief)**

Plaintiff also alleges a claim that the Service failed to reinitiate consultation on the

Comprehensive Conservation Plan ("the Plan"). The ESA's implementing regulations require an

action agency to reinitiate consultation with the consulting agency as follows:

> Reinitiation of consultation is required and shall be requested by the Federal agency
> or by the Service, where discretionary Federal involvement or control over the
> action has been retained or is authorized by law and:
> (1) If the amount or extent of taking specified in the incidental take statement is
> exceeded;
> (2) If new information reveals effects of the action that may affect listed species or
> critical habitat in a manner or to an extent not previously considered;
> (3) If the identified action is subsequently modified in a manner that causes an
> effect to the listed species or critical habitat that was not considered in the biological
> opinion or written concurrence; or
> (4) If a new species is listed or critical habitat designated that may be affected by
> the identified action.

50 C.F.R. § 402.16(a). The regulation is written using trigger language: "if" any one of four

conditions listed in sections (1) through (4) is satisfied, then "[r]einitiation of formal consultation is required." *See Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1093 (N.D. Cal. 2016); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1086 (9th Cir. 2015) (agency "was required to reinitiate consultation when" one of the four trigger conditions was satisfied).

Plaintiff contends that reinitiation should have been conducted under 50 C.F.R. § 402.16(a)(4), alleging that the Service has "ongoing involvement and control over implementing and revising the Plan," and that since the Plan was completed the Service has "listed the red knot, classified loggerhead sea turtles that use Cape Romain into a [distinct population segment ("DPS")], and designated loggerhead sea turtle critical habitat" but has not reinitiated consultation on the Plan.  Compl. ¶¶ 158, 159.

Plaintiff runs afoul of the statute of limitations for their claims that the Service should have reinitiated consultation after the designation of the Cape Romain DPS of the loggerhead sea turtle, which occurred in September 2011, and the designation of loggerhead sea turtle critical habitat, which occurred in July 2014.  Compl. ¶¶ 72–73.  Where, as here, a plaintiff alleges that an agency failed to comply with the ESA's procedural requirements, the general six-year statute of limitations set forth in 28 U.S.C. § 2401(a) applies.  *Ctr. for Biological Diversity v. Envtl. Prot. Agency*, 847 F.3d 1075, 1087 (9th Cir. 2017); *Jones v. Gordon*, 792 F.2d 821, 824–25 (9th Cir. 1986) (holding that the six-year limitations period applied to a claim that an agency "failed to comply with the procedural requirements" of an environmental statute); *Ctr. for Biological Diversity v. Envtl. Prot. Agency*, 847 F.3d 1075, 1087 (9th Cir. 2017) (Rejecting arguments that no limitations period applies to claims because the Service has a continuing duty to comply with Section 7 of the ESA, and failure to initiate consultation constitutes a "continuing violation" that

excuses a limitations period).  Plaintiff filed this complaint in October 2020, more than six years
after both the September 2011 designation of the Cape Romain DPS of the loggerhead sea turtle
and the July 2014 designation of loggerhead sea turtle habitat.  Plaintiff is within the statute of
limitations for their reinitiation claim only as to the listing of the red knot, which occurred in
2015.

Plaintiff does not allege that the Service approved, amended, or revised the Plan and that
this act is what triggers reinitiation of consultation—instead, they state that the Service has
"ongoing involvement and control" over the Plan and the listing of the red knot is a "new
development[t]" that triggers reinitiation.  Compl. ¶¶ 159–160.  While the act of approving,
amending, or revising the Plan may constitute "action" under Section 7(a)(2), *see* 50 C.F.R.
402.02 (listing the "promulgation" of regulations as an example of "action" under § 7), once
approved the mere existence of the Plan does not constitute "ongoing action" such that it would
require reinitiation of consultation.  This is because the Plan is a framework for guiding refuge
management decisions.  It is implemented through the approval of proposed projects and
activities that are consistent with its direction.  That is, the Plan acts as a road map on which the
Service relies to guide its management of Cape Romain.  It is at the project level that the "agency
action" takes place.  *See Forest Guardians v. Forsgren*, 478 F.3d 1149, 1155 (10th Cir. 2007)
(Agency is not required to reinitiate consultation on previously approved forest plans even if new
species or critical habitat are listed after a plan is approved, as the forest plan only provides a
framework for later project decisions); *Cf. Karuk Tribe of California v. U.S. Forest Serv.*, 681
F.3d 1006 (9th Cir. 2012) (Ongoing agency action that is based upon regulatory authority or
discretionary control does not trigger Section 7).  *Compare Norton v. S. Utah Wilderness All.*,
542 U.S. 55, 59 (2004) (describing land use plans as guiding and controlling future management

actions).

### C.    Plaintiff's ESA Section 9 Claim (Sixth Claim for Relief) Fails

Plaintiff levies an ESA Section 9 claim against the Service, alleging that "by allowing or otherwise facilitating horseshoe crab harvesting in Cape Romain, the Service has caused a take of the red knot."  Compl. ¶ 168.  But Plaintiff fails to link any allegations of harm to the red knot to the Service's actions.  This is fatal to their section 9 claim.

ESA Section 9 makes it illegal for any person to "take" an endangered species. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. "Harm" means "an act which actually kills or injures wildlife," but includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*   "It is well accepted that proximate cause is an element of ESA Section 9 claims." *Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) (collecting cases).  "In the context of the ESA, proximate cause issues entail determining whether the alleged injury . . . is fairly traceable to the challenged action of Defendants." *Id.* There is no proximate causation between the Service issuing the 2014 Special Use Permit and a take of red knot.

To establish a claim under Section 9, a plaintiff must show that an activity of the defendants has actually had some prohibited impact on an endangered species.  *Palila v. Hawaii Dep't of Land and Natural Resources*, 639 F.2d 495, 497 (9th Cir. 1981) (citing Barcelo v.

Brown, 478 F. Supp. 646 (D.P.R.1979)).  Plaintiff must do more than present vague or

speculative theories of harm; they must present evidence of a causal connection between an

action of the defendant and demonstrable harm to the species.  *Cf. Morrill v. Lujan*, 802 F. Supp.

424, 430-432 (S.D. Ala. 1992) (denying preliminary injunction to enjoin alleged Section 9

violation where plaintiffs could not demonstrate causal link from proposed development project

to actual habitat degradation, and from habitat degradation to projected harm to species, but

relied on speculative theories of harm). The Supreme Court emphasized that "every term in the

regulation's definition of 'harm' is subservient to the phrase 'an act which actually kills or

injures wildlife."  *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) (quoting

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 700 n. 13

(1995)).

        The only factual allegations that Plaintiff makes about any act that the Service has

engaged in that leads to a take of the red knot—the acts that "allo[w] or otherwise facilitate[e]

horseshoe crab harvesting in Cape Romain," Compl 168—is that the Service's 2016 letter in

which the Service communicated to Mr. Munn that he "has access to the entirety of the refuge to

engage in commercial fishing" "facilitated" Munn's "continued use" of Cape Romain for

horseshoe crab harvesting, Compl ¶ 96.  That Plaintiff stylizes the 2016 letter as a "2016

authorization" does not make it an authorization.  It is a letter that states certain islands within

the Refuge are closed to foot traffic and anchoring from February 15 through September 15, and

that the remainder of Cape Romain is open "to access."  ECF No. 1, Ex. 5 at 2.  The "access"

could refer to any number of activities.  Certainly, the 2016 letter makes clear that the Service

"ha[s] no interest in regulating navigation or commercial fishing conducted by *lawful means* on

the Refuge."  ECF No. 1, Ex. 5 at 2 (emphasis added).   But commercial fishing is an activity

controlled by the state of South Carolina under the terms of the lease for Cape Romain between the state and the United States.  The Service has no authority over the horseshoe crab harvesting. While the 2016 letter ends by stating that "[o]ur offer remains to discuss a special use permit to utilize Garris Landing facility after hours if needed for easier access," *Id.*, Plaintiff does not allege that Munn *needs* the Garris Landing boat landing to harvest horseshoe crab.

Similarly, the 2014 Special Use Permit issued to Munn states that the activity authorized by the permit is "Access to Garris Landing During Closed Hour," that such a "request will be considered only during horseshoe crab harvest season."  ECF No. 1, Ex. 9 at 2.  While the Special Use Permit is confined to use only during horseshoe crab harvesting season, it does nothing more than allow Munn access to a boat landing within the Refuge.  Even without access to this boat landing, Munn could still engage in horseshoe crab harvesting within the Refuge— after all, the Refuge consists of more than 60,000 acres.  Indeed, the CCP itself states that "[a]side from Garris Landing, other area boat landings that provide entrance to the refuge include McClellanville landing, Buck Hall Recreation Area, Wild Dunes Marina, and Gadsenville Landing.  Visitors also access refuge waters from their private docks and many moor their watercraft at the public dock at Bulls Island."  ECF No. 1, Ex. 2 at 82.  Additionally, Munn could use his Special Use permit to access to Garris Landing to engage in any number of recreational activities.  This is all to say that the Service does not authorize Munn to harvest horseshoe crabs. And indeed, such an act would be outside the Service's authority.  Under the terms of the lease between the State and the United States, it is the state of South Carolina that retains authority over salt water species within the Refuge boundaries.  And it is the South Carolina Department of Natural Resources that issued Munn the horseshoe crab harvesting permit.

At bottom, Plaintiff complains of horseshoe crab harvesting that is authorized by the

2:20-cv-03657-BHH    Date Filed 01/18/21    Entry Number 16    Page 22 of 33

South Carolina Department of Natural Resources.  It is the state agency that provides Munn with

permits to engage in horseshoe crab harvesting.  The Service has no authority to intervene in, or

even influence, that separate state permitting process. Where, as here, "an agency has no ability

to prevent a certain effect due to its limited statutory authority over the relevant actions, the

agency cannot be considered a legally relevant 'cause' of the effect."  *Department of Transp. v.*

*Public Citizen*, 541 U.S. 752, 770 (2004); S*ee Center for Biological Diversity v. U.S. Dep't of*

*Housing & Urban Dev.*, 541 F. Supp. 2d 1091, 1100-01 (D. Ariz. 2008) (rejecting ESA claim

where agency action was not the "legal cause of the harm to the listed species"), *aff'd*, 2009 WL

4912592 (9th Cir. Nov. 25, 2009).

        Plaintiff's attenuated causal theory also fails as a factual matter.  That is, Plaintiff has

alleged no actions undertaken by the Service that are "fairly traceable" to the take they allege.

*Cascadia Wildlands*, 911 F. Supp. 2d at 1084.  *See Center for Biological Diversity v. U.S. Dep't*

*of Housing & Urban Dev.*, 541 F. Supp. 2d 1091, 1100-01 (D. Ariz. 2008) (ESA not triggered by

agency loan guarantees that supposedly encouraged third-party development affecting listed

species), *aff'd*, 2009 WL 4912592 (9th Cir. Nov. 25, 2009).

        Under the strict causation standard of ESA Section 9,[4] Plaintiff must allege that its

---

[4] The caselaw interpreting the required causation level to allege section 9 liability is clear.  But
even if the statutory provision were ambiguous, a strict causation standard should be applied.
        Section 9 includes both civil and criminal components. *See, e.g.*, 16 U.S.C. §
1540(b)(1)("Any person who knowingly violates any provision of this chapter, of any permit or
certificate issued hereunder, or of any regulation issued in order to implement [certain]
subsection[s] . . . shall, upon conviction, be fined not more than $50,000 or imprisoned for not
more than one year, or both.").  Courts are reluctant to relax causation standards when liability
itself is at issue, especially when that liability derives from a statute with criminal components
like the ESA.  *See, e.g., Burrage v. United States*, 571 U.S. 204, 214–15 (2014) (describing
departure from "the usual but-for causation requirement" in cases addressing criminal liability as
"rare").  Notably, the rule of lenity applies even when a statute with criminal components is
being enforced civilly, like the ESA is here, because courts "must interpret the statute
consistently, whether [they] encounter its application in a criminal or noncriminal context."
*Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see also United States v. Thompson/Center Arms*

alleged harm—the take of red knot—would not have occurred but for the Service's actions. They have not and cannot do so. Accordingly, their Section 9 claims should be dismissed.

## III.    The Court Should Dismiss Plaintiff's MBTA Claim (Seventh Claim for Relief)

Plaintiff contends that the Service, as the "action agency authorizing horseshoe crab harvesting in [Cape Romain National Wildlife Refuge]" is in violation of the MBTA, as "[h]orseshoe crab harvesting in Cape Romain has resulted in the destruction of migratory bird eggs from overheating and predation . . . [and] has also resulted in the death of migratory bird chicks by exposing them to predators." Compl. ¶¶ 175-176. The Court lacks jurisdiction over this claim and it fails to state a claim for several reasons: (1) Plaintiff has not allege facts sufficient to establish standing under the MBTA; (2) Plaintiff has failed to allege that the Service's "authorization" of horseshoe crab harvesting constitutes a "final agency action" that is cognizable under the APA's judicial review provision; and (3) Plaintiff has failed to allege facts that support a theory of "take" under the regulations promulgated by the Secretary that interpret the scope of the MBTA.

As an initial matter, Plaintiff has not alleged and cannot allege facts sufficient to support standing under Article III. To establish standing:

---

*Co.*, 504 U.S. 505, 517-518 (1992) (plurality opinion) (applying the rule of lenity to a tax statute in a civil setting because the statute had criminal applications and thus had to be interpreted consistently with those applications); *Crandon v. United States*, 494 U.S. 152, 158 (1990) ( "[B]ecause the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage.").

A relaxed interpretation of the causation standard in section 9 would deny Defendants "fair warning 'of what the law intends to do if a certain line is passed.'" *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012) (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995); *Crandon*, 494 U.S. at 160 ("[C]onstruction of a criminal statute must be guided by the need for fair warning"). This is consistent with the views articulated in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 697 (1995), where the Court stated that the definition of harm in ESA Section 9 "did not need to include 'actually' to connote 'but for' causation, which the other words in the definition obviously require."

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-81 (2000).

Plaintiff brings this case on "its own institutional behalf and on behalf of its members." Compl. ¶ 11. Thus, it can sue either on its own behalf ("organizational standing") or on behalf of its members ("representational standing"). Representational standing requires an organization to allege that "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) (internal citation omitted). Plaintiff has not alleged facts sufficient to fulfill the redressability prong for either organizational or representational standing.

The requirement of a causal link and redressability are closely related. *See Railway Labor Executives Ass'n v. Dole*, 760 F.2d 1021, 1023 (9th Cir. 1985); *see also Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 72–78 (1978). The injury of which Plaintiff complains—effects to migratory birds from horseshoe crab harvesting—is not traceable to the actions of the Service, and so there is not a substantial likelihood that declaratory relief would redress the injury. The only "facilitation" of this horseshoe crab harvesting that Plaintiff alleges the Service engaged in is the issuance of the 2014 Special Use Permit to use Garris Landing as a boat launch and the April 2016 letter stating that Marsh Island, White Banks, and Sandy Point

were closed from February 15 through September 15. At no point does Plaintiff allege facts

sufficient to make the deduction that if the Service had not issued the Special Use Permit in

2014—which was only valid for one year according to the terms of the permit—or sent the April

2016 letter, horseshoe crab harvesting would not occur within the Refuge. This is because it

cannot do so. In accordance with the terms of the lease between the State of South Carolina and

the United States that created Cape Romain the State of South Carolina retains authority over all

shellfish. It is the State of South Carolina Department of Natural Resources that issues the

permits authorizing horseshoe crab harvesting. The injury that Plaintiff complains of is not

traceable to the actions of the Service, and so the redressability prong has not been fulfilled. *See*

*ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (Finding no standing where organization's

redress ""depends on the unfettered choices made by independent actors not before the courts

and whose exercise of broad and legitimate discretion the courts cannot presume either to control

or to predict."); *Allen v. Wright*, 468 U.S. 737, 758 (1984) (where the injury to the plaintiffs "is

highly indirect and 'results from the independent action of some third party not before the

court,'" the plaintiff lacks standing) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26,

42 (1976)); *Cf. Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1105 (E.D. Cal. 2002), *aff'd sub*

*nom. Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003) (no causation

against state gaming agency for minor licensing responsibilities when separate tribal gaming

agency primarily responsible for licensing).

Even if the Court finds that Plaintiff has alleged sufficient facts to establish standing,

Plaintiff's claim for relief that the Service engaged in agency action that was contrary to law

because it violated the MBTA is predicated upon the APA, 5 U.S.C. § 706. *See Hill v. Norton*,

275 F.3d 98, 103 (D.C. Cir. 2001) (no private right of action under the Migratory Bird Treaty

Act so challenge could only be made under the APA) (superceded by statute on other grounds).

Under the APA, the Service's decision may be set aside only if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  But the

APA's judicial review provision is clear—it applies only to final agency actions.  *Id.* § 704.

Absent a specific, final agency action, the court lacks subject matter jurisdiction to review an

agency's conduct.  *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010).

Plaintiff has failed to assert such an action here.

The issuance of the 2014 Special Use Permit to use Garris Landing as a boat launch and

the April 2016 letter are the only actions that comprise the Service's alleged "allowing or

otherwise facilitating horseshoe crab harvesting in Cape Romain." Compl. ¶ 168.  The APA's

provision allowing judicial review of "agency action," 5 U.S.C. § 702, does not encompass this

alleged "authorizing" of horseshoe crab harvesting.  As the Fourth Circuit has clearly explained,

"[t]he term 'action' as used in the APA is a term of art that does not include all conduct such as,

for example, constructing a building, operating a program, or performing a contract.  Rather, the

APA's definition of agency action focuses on an agency's determination of rights and

obligations." *Vill. of Bald Head Island v. Army Corp of Eng'rs*, 714 F.3d 186, 193 (4th Cir.

2013) (citation omitted), *aff'g* 833 F. Supp. 2d 524, 532 (E.D.N.C. 2011) (finding that agency

letters did not constitute agency action). *See also Ass'n of Admin. Law Judges v. U.S. Off. of

Pers. Mgmt.*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) ("Not everything an agency does constitutes

final agency action reviewable by the courts. 'Much of what an agency does is in anticipation of

agency action. Agencies prepare proposals, conduct studies, meet with members of Congress and

interested groups, and engage in a wide variety of activities that comprise the common business

of managing government programs.'") (quoting *Fund for Animals Inc. v. U.S. Bureau of Land*

*Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("Agency action" is "not so all-encompassing as to authorize . . . judicial review over everything done by an administrative agency.") (second alteration in original) (citation omitted). Plaintiff has alleged no activity by the Service that qualifies as a final agency action under the APA, and so this Court lacks jurisdiction to review this claim.

Finally, even if the Court is not persuaded by the standing and APA arguments, the governing interpretation of the MBTA is "quite narrow," *Protect our Cmtys. Found. v. Jewell*, No. 13CV575 JLS (JMA), 2014 WL 1364453, *21 (S.D. Cal., Mar. 25, 2014), *aff'd Protect Our Communities Found. v. Jewell*, 825 F.3d 571 (9th Cir. 2016); *see also Protect our Cmtys. Found. v. Salazar*, No. 12-CV-2211-GPC(PCL), 2013 WL 5947137, at *18–19 (S.D. Cal. Nov. 6, 2013) ("Plaintiffs have failed to demonstrate that a permit is required under the MBTA for an unintentional killing of migratory birds."), *aff'd sub nom. Backcountry Against Dumps v. Jewell*, No. 13-57129, 2017 WL 56300 (9th Cir. Jan. 5, 2017). The MBTA does not require Federal agencies acting in their regulatory capacity to seek MBTA permits before authorizing third-party activities that may result in the incidental, unintentional taking of migratory birds. The Secretary has reiterated this longstanding interpretation of the MBTA in consistent briefing before the courts, which is entitled to deference. *Auer v. Robbins*, 519 U.S. 452, 462–63 (1997) (holding that a statutory interpretation advanced in a legal brief is worthy of deference); *Decker v. Northwest Environmental Defense Center*, 133 S.Ct. 1326, 1337–38 (2013) (deferring to consistent agency view). The Service has also recently promulgated a regulation interpreting the meaning of "take" under the MBTA as not including incidental take. 86 Fed. Reg. 1134 (DATE). This regulation, which states that the MBTA's take prohibitions "reach only actions directed at migratory birds, their nests, or their eggs," makes clear that Plaintiff's theory of take is not

cognizable because it is premised on the Service's authorization of horseshoe crab harvesting as opposed to any authorization of actions *directed* at migratory birds. For the foregoing reasons, Plaintiff has failed to allege a cognizable MBTA claim.

## IV.    The Court Should Dismiss Plaintiff's Refuge Act Claims (First through Third Claims for Relief)

Plaintiff alleges that the Service violated the Refuge Act by (1) failing to complete a compatibility determination for commercial horseshoe crab harvesting on the Refuge prior to authorizing this use; (2) failing to issue a special use permit authorizing commercial horseshoe crab harvesting on the Refuge; and (3) allowing and otherwise facilitating Mr. Munn to engage in the harvest of horseshoe crabs undermines the purpose of the Refuge protect migratory birds due to his illegal entry onto closed portions of the Refuge. The Court should dismiss each of these claims, because Plaintiff ignores the fact that the Service does not have authority over the authorization of commercial horseshoe harvesting on the Refuge under the 1991 Lease. The property interest obtained by the Service from the State through the 1991 Lease is subject to the ability of the State to "authorize the taking of shellfish, finfish, and other salt water species within the refuge boundary." ECF No. 1-1.

### A.    The Refuge Act does not require the Service to issue a Compatibility Determination for commercial fishing operations in the Refuge authorized by the State under the 1991 Lease

The Service does not have jurisdiction to "authorize" commercial fishing activity on the portions of the Refuge subject to the 1991 Lease. Under South Carolina law, courts construe lease provisions under rules of contract interpretation. *See United Dominion Realty Trust, Inc. v. Wal–Mart Stores, Inc.*, 307 S.C. 102, 105–07 (Ct.App.1992) (applying the rules of contract construction to interpret the lease of a shopping center). To determine the intention of the parties, the court "must first look at the language of the contract." *C.A.N. Enters., Inc. v. South*

*Carolina Health and Human Servs. Fin. Comm'n*, 296 S.Ct. 373, 377, (1988).  A contract is read
as a whole document so that one may not, by pointing out a single sentence or clause, create an
ambiguity. *Southern Atlantic Financial Services, Inc. v. Middleton*, 356 S.Ct. 444 (2003).  In
general, if the contract is unambiguous, clear, and explicit, the Court must construe it according
to the terms the parties have used, and the terms are to be taken and understood in their plain,
ordinary, and popular sense. *Ingram v. Kasey's Associates*, 340 S.C. 98 (2000).

Here, the lease clearly contains a reservation that the Lease is subject to the State's
continued ability to "authorize" the taking of saltwater species, such as horseshoe crabs, within
the Refuge boundary.  The Lease also sets forth that the land is "being leased for administration
by the Secretary of Interior through the United Stater Fish & Wildlife Service as a national
wildlife refuge."  ECF No. 1-1.  Read together, the plain meaning of these two clauses shows
that the State desired to retain the ability to "authorize" the harvesting of saltwater species even
though the lessee was to use the land as a wildlife refuge.

Although the Service may limit, and indeed has limited, the *scope* of this authorization
for commercial fishing activity on the leased portions of the Refuge, the State explicitly reserved
its ability to "authorize" such activity.  Plaintiff admits that the Service has prohibited horseshoe
crab harvests from Marsh Island, White Banks, and Sandy Point.  Comp. ¶ 96.  However, it does
not follow that just because the Service has limited the scope of an activity on the Refuge, that
the Service is then required to issue a Compatibility Determination for that activity when it has
no authority to determine whether or not such an activity should be "authorized."

Indeed, the Service has never "authorized" commercial horseshoe crab harvesting on the
Refuge.  As discussed above in Section I.C., Plaintiff's characterization of the 2016 letter as a
"2016 authorization" does not make it an authorization, because it merely states that certain

islands within the Refuge are closed to foot traffic and anchoring from February 15 through September 15, and that the remainder of Cape Romain is open "to access."  ECF No. 1-5, 2.  Similarly, the 2014 Special Use Permit issued to Mr. Munn states that the activity authorized by the permit is "Access to Garris Landing During Closed Hour," and that such a "request will be considered only during horseshoe crab harvest season."  ECF No. 1-9 at 2.  Even without access to this boat landing, Mr. Munn could still engage in horseshoe crab harvesting within the Refuge—the CCP itself states that "[a]side from Garris Landing, other area boat landings that provide entrance to the refuge include McClellanville landing, Buck Hall Recreation Area, Wild Dunes Marina, and Gadsenville Landing."  ECF No. 1-2, 82

Thus, the Court should dismiss Plaintiff's claim that the Service is required to issue a compatibility determination for the authorization of commercial horseshoe crab harvesting on the Refuge property subject to the 1991 Lease.

**B.     The Refuge Act does not require the Service to issue a special use permit for commercial fishing operations in the Refuge authorized by the State under the 1991 Lease**

Plaintiff asserts that the Service violated the Refuge Act when it failed to issue a special use permit to Mr. Munn to "authorize" his horseshoe crab harvests on the Refuge.  Compl. ¶ 138-141.  Refuge Act regulations provide that "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." 50 C.F.R. § 27.97.  However, for areas held by the United States in less than fee, the regulations implementing the Refuge Act "apply only to the extent that the property interest held by the United States may be affected."  50 C.F.R. § 25.11(a).  Here, the United States' property interest in the lands subject to the 1991 Lease does not include the ability to control the "authorization" of commercial fishing activity such as the harvesting of horseshoe crabs.  As discussed above, the Service has the

discretion to put limits on this commercial activity, such as the closure of certain islands, but it does not have ability to "authorize" this activity, and indeed has never issued an "authorization" for Mr. Munn or any other horseshoe crab harvesters.  As discussed above, the State is the entity that has issued the permit for Mr. Munn to conduct horseshoe crab harvests on the Refuge.

### C.    The Service has not "allowed" Mr. Munn to harvest horseshoe crabs on closed portions of the Refuge

Plaintiff alleges that "allowing and otherwise facilitating" Mr. Munn to engage in the harvest of horseshoe crabs, undermines the purpose of the Refuge to protect migratory birds due to his alleged illegal entry onto closed portions of the Refuge.  Compl. ¶¶ 149-150. As discussed extensively above, the Service has not "allowed" or "facilitated" Mr. Munn's alleged illegal harvest of horseshoe crabs on the closed islands.  The Service explained in its 2012 and 2016 Letters to Mr. Munn that his permit from the State did not authorize horseshoe crab harvesting on closed portions of the Refuge.  The 2016 Letter stated that the Service's "establishment of the temporary closure regulation described above is only a result of our mandate to fulfill the purpose of the refuge."  ECF No. 1-5. Any poaching of horseshoe crabs on the closed portions of Refuge is in violation of both Refuge regulations and the State's harvesting permit.  Plaintiff cannot show actions by a private citizen, in violation of state and federal law, can give rise to a claim against the Service.

**CONCLUSION**

For the reasons stated above, the Court should grant Defendants' motion to dismiss

Plaintiff's Complaint for Declaratory and Injunctive Relief with prejudice, and enter judgment in

favor of Defendants.

Dated: January 18, 2021                    Respectfully submitted,

                                          JEAN E. WILLIAMS
                                          Deputy Assistant Attorney General
                                          Environment and Natural Resources Division
                                          SETH M. BARSKY, Chief
                                          MEREDITH FLAX, Assistant Chief

                                          By:   /s/ Shampa A. Panda
                                          SHAMPA A. PANDA, Trial Attorney
                                          CA Bar No. 316218
                                          United States Department of Justice
                                          Environment & Natural Resources Division
                                          Wildlife & Marine Resources Section
                                          P.O. Box 7611
                                          Washington, D.C. 20044-7611
                                          Tel: (202) 305-0431; Fax: (202) 305-0275
                                          Email: shampa.panda@usdoj.gov

                                          PETER M. MCCOY, JR.
                                          UNITED STATES ATTORNEY
                                          Jacqueline LaPan Edgerton (#11710)
                                          Assistant United States Attorney
                                          151 Meeting Street, Suite 200
                                          Charleston, South Carolina 29402
                                          Telephone: (843) 266-1666
                                          Email: Jacqueline.edgerton@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2021 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

  /s/ Shampa A. Panda
