IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Defenders of Wildlife, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Fish and Wildlife Service, | ) | Civil Action No. 2:20-cv-3657-BHH |
| | ) | |
| Defendant, | ) | **ORDER** |
| | ) | |
| and | ) | |
| | ) | |
| Charles River Laboratories | ) | |
| International, Inc., | ) | |
| | ) | |
| Intervenor/Defendant. | ) | |

This is an action filed by Plaintiff Defenders of Wildlife ("Plaintiff" or "Defenders"), challenging Defendant U.S. Fish and Wildlife Service's ("Defendant" or "Service") alleged allowance of commercial harvesting of horseshoe crabs from the Cape Romain Wildlife Refuge ("Cape Romain" or "Refuge") in violation of: (1) the National Wildlife Refuge System Improvement Act of 1997 ("Refuge Improvement Act"), 16 U.S.C. §§ 668dd–668ee, (2) the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44, and (3) the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703–12.

## PROCEDURAL BACKGROUND

Plaintiff filed its complaint on October 19, 2020, asserting the following seven claims against the Service:

(1) violation of the Refuge Improvement Act for failure to make a compatibility determination for commercial horseshoe crab harvesting in Cape Romain;

(2) violation of the Refuge Improvement Act for failure to issue a special use permit for commercial activity on the Refuge;

(3) violation of the Refuge Improvement Act for failing to provide for conservation and undermining the purposes of the Refuge;

(4) violation of the ESA for failure to consult with the appropriate wildlife agency on horseshoe crab harvesting authorization;

(5) violation of the ESA for failure to reinitiate consultation on the Cape Romain Comprehensive Conservation Plan after the *rufa* red knot ("red knot") shorebird and loggerhead sea turtle were listed as threatened species;

(6) violation of the ESA for the unpermitted "take" of the red knot; and

(7) violation of the MBTA based on the death of migratory shore birds due to horseshoe crab harvesting on the Refuge.

(*See* ECF No. 1.)

The Service filed a motion for an extension of time to respond to Plaintiff's complaint, which the Court granted, giving the Service until January 18, 2021, to respond. Before the Service responded to Plaintiff's complaint, however, Charles River Laboratories International, Inc. ("Charles River Labs"), which relies on the harvest of horseshoe crabs in South Carolina and uses the bacteria-detecting *Limulus* Amebocyte Lysate ("LAL") in the horseshoe crabs' blood to test the safety of injectable pharmaceutical drugs and vaccines, filed a motion to intervene. The Court granted Charles River Labs' motion as unopposed on February 3, 2021.

On January 18, 2021, the Service responded to Plaintiff's complaint by filing a motion to dismiss pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. In its motion, the Service asserts that the State of South Carolina, and not the Service, authorizes the harvesting of horseshoe crabs on the Refuge, and that the Service has not taken any final agency action authorizing the commercial harvesting of horseshoe

2

crabs on the Refuge.

On March 3, 2021, Charles River Labs filed a motion for judgment on the pleadings, raising many of the same arguments the Service raised in its motion to dismiss but going one step further by arguing that the Service has absolutely no jurisdiction to regulate the commercial harvesting of horseshoe crabs on the Refuge because the State of South Carolina reserved the "exclusive" right to regulate such activity through state-issued permits.

On March 5, 2021, almost five months after filing its complaint, Plaintiff filed a motion for preliminary injunction.  In its motion, Plaintiff seeks a preliminary injunction with respect to the first five claims in its complaint, which address the Service's alleged violations of the Refuge Improvement Act and the ESA.  Specifically, Plaintiff seeks an order (1) temporarily enjoining the Service from allowing commercial horseshoe crab harvesting within Cape Romain until it can remedy the statutory violations identified in Claims 1-5 and (2) temporarily enjoining Charles River Labs and its contractors and agents from harvesting or purchasing horseshoe crabs from Cape Romain.

The Court held a video hearing on Plaintiff's motion for preliminary injunction on April 15, 2021, and took the matter under advisement.  At the conclusion of the hearing, the Court asked Plaintiff to submit a proposed order, which Plaintiff did the same day.  The Court gave the Service and Charles River Labs until April 23 to comment on the contents of Plaintiff's proposed order, and both the Service and Charles River Labs did so on April 23.

On April 22, 2021, however, the State of South Carolina, ex rel. Alan Wilison, Attorney General ("the State"), filed a motion to intervene in this case as a matter of right

3

or, in the alternative, permissively, pursuant to Rule 24(a) and (b) of the Federal Rules of Civil Procedure. In its motion, the State asks the Court to defer ruling on Plaintiff's motion for preliminary injunction until the Court rules on the State's motion to intervene (and permits the State to respond to the motion, should the Court grant the motion to intervene).[1]

Plaintiff immediately responded to the State's motion to intervene, first objecting to the State's request for deferral of a ruling on Plaintiff's motion for preliminary injunction. Plaintiff filed a subsequent response on May 6, 2021, specifically objecting to the State's request to intervene. In essence, Plaintiff asserts that the State did not timely submit its motion to intervene because it learned of the case when it was filed in October of 2020.

The aforementioned matters are ripe for the Court's review, and for the reasons set forth on the record during the hearing on April 15, 2021, and for the additional reasons set forth herein, the Court denies the Service's motion to dismiss; the Court denies without prejudice Charles River Labs' motion for judgment on the pleadings; the Court grants in part Plaintiff's motion for a preliminary injunction; and the Court grants the State's motion to intervene but denies the State's request that the Court defer ruling on Plaintiff's motion for preliminary injunction.

## FACTUAL BACKGROUND

Cape Romain, which is located in Charleston County, South Carolina, was created by Congress in 1932 "for use as an inviolate sanctuary, or for any other management purpose, for migratory birds." 16 U.S.C. § 715d. Pursuant to the Refuge Improvement Act,

---

[1] In its motion, the State also asserts that it is a required party pursuant to Rule 19 of the Federal Rules of Civil Procedure, but the Court finds the State's reliance on Rule 19 misplaced, as the State is not currently a party to the case.

4

Cape Romain is now administered by the Secretary of the Interior and the United States

Fish and Wildlife Service as part of the National Wildlife Refuge System.  Through various

acquisitions since its inception, Cape Romain has grown to include approximately 66,000

acres, primarily composed of bays and estuarine emergent wetlands, with barrier islands

that run along 22 miles of the South Carolina coast.  (ECF No. 1-2 at 24, 33 (Cape Romain

National Wildlife Refuge 2010 Comprehensive Conservation Plan ("CCP")).)  One such

acquisition occurred in 1991, when the federal government entered into a 99-year lease

("1991 Lease") with the State of South Carolina acquiring:

> all of the State of South Carolina's interest in all marsh lands, sand banks,
> shores, edges, lands uncovered by water at low tide, and all waterbottoms
> and waters which are included within the boundaries of the [Refuge], or which
> are contiguous and adjacent to the easterly boundary and fronting on the
> Atlantic Ocean at mean low tide.

(ECF No. 1-1.)  Importantly, the 1991 Lease specifically provides that it is "subject to [ ]

[t]he right of the State of South Carolina to authorize the taking of shellfish, finfish, and

other salt water species within the refuge boundary."  (*Id.*)

Among other species listed in the Endangered Species Act, the threatened red knot,

the threatened piping plover, and the threatened Northwest Atlantic Ocean Distinct

Population Segment ("DPS") of the loggerhead sea turtle all reside in Cape Romain.

Between approximately April and June of each year, horseshoe crabs spawn on the

beaches of Cape Romain's islands, where the red knot and other migratory birds rely on

the crabs' nutrient-rich eggs as a critical food source during their northward migration from

South America to the Arctic.[2]

In this action, Plaintiff contends that since at least 2014 the Service has allowed and facilitated the commercial harvesting of horseshoe crabs in the intertidal zone of the Refuge's islands by harvesters contracted by Charles River Labs, which relies on the harvest of horseshoe crabs in South Carolina and uses the LAL in the crabs' blood to test the safety of injectable pharmaceutical drugs and vaccines.[3]  Plaintiff alleges that the commercial horseshoe crab harvesting imperils the threatened red knot, which has been visiting the Refuge in declining numbers in recent years, and that the harvesting also imperils the piping plover population, as the bird is sensitive to human disturbances.  In addition, Plaintiff asserts that the commercial harvesting negatively impacts the endangered

---

[2] According to the declaration of Dr. Lawrence Niles, horseshoe crabs have existed on Earth for more than 400 million years, and adult horseshoe crabs generally live on the seafloor in coastal areas.  They spawn on an annual basis between the mean low tide and the mean high tide, and females spawn on rising and high tide and lay their eggs approximately six inches below the surface of the beach.  Long-distance shorebirds such as the red knot cannot access the horseshoe crab egg clusters deposited at six inches deep; instead, they rely on the female horseshoe crabs digging down and laying their eggs at a density sufficient to cause displaced eggs to rise to the surface.  The shorebirds then consume large quantities of the displaced horseshoe crab eggs on the surface of the beach to fuel them for their northward migration.  (*See* ECF No. 29-2 at 4-5.)  The horseshoe crab eggs allow foraging red knots to gain about six grams per day, whereas red knots consuming other sources of prey, such as clams and mussels, can gain only one to two grams per day.  Each red knot that refuels using horseshoe crab eggs must consume about 400,000 eggs.  (*See id.* at ¶¶ 48-49, 55.)

[3] In 2014, for example, Charles River Labs' contractors and/or agents collected 25,000 horseshoe crabs. (ECF No. 1-7 at 2.)  According to Charles River Labs, the horseshoe crabs are returned unharmed to their natural habitat following the bleeding process. (ECF No. 12-1 at 4.)  Plaintiff asserts, however, that the harvesting can cause the death of up to 30 percent of harvested horseshoe crabs after their bleeding and release, relying on the declaration of Dr. Lawrence Niles.  (ECF Nos. 29 at 9 and 29-2 at ¶ 23.)  Plaintiff also asserts that even if the crabs survive the harvesting, their chances of survival are lowered and they are less likely to lay eggs even when returned to the areas from which they were harvested.  (*Id.*)  Charles River Labs instead points to information from the South Carolina Department of Natural Resources that indicates a 10 to 20 percent mortality rate for crabs harvested for LAL production.  (ECF No. 33 at 26.)  Charles River Labs also asserts that it has observed a mortality rate of only four percent.  (*Id.*)  Regardless of the correct percentage, Charles River Labs' assertion that the crabs are returned "unharmed" is belied by its admission that the harvesting causes the deaths of at least some percentage of the harvested crabs.  It is clear, therefore, that the commercial harvesting of horseshoe crabs in the Refuge negatively affects the number of horseshoe crab eggs laid in the Refuge each year.

Northwest Atlantic Ocean DPS of the loggerhead sea turtle, which relies on horseshoe crabs as a source of prey.  Overall, Plaintiff asserts that commercial horseshoe crab harvesting by Charles River Labs' contractors and/or agents has adversely affected the above-mentioned threatened species' abilities to breed, feed, and shelter.

As previously mentioned, Plaintiff specifically contends that the Service has breached its legal obligations and has violated the Refuge Improvement Act by: (1) failing to determine whether commercial horseshoe crab harvesting is compatible with Cape Romain's purposes, *see* 16 U.S.C. § 668dd(d)(3)(A)(I); (2) failing to issue the commercial harvesters a special use permit authorizing such commercial activities, *see* 50 C.F.R. § 27.97; and (3) failing to ensure that its management of Cape Romain will provide for the conservation of wildlife and will not undermine the Refuge's purposes, *see* 16 U.S.C. § 668d(a)(4)(A) and (D).  Plaintiff also contends that the Service has failed to comply with the substantive and procedural requirements of the ESA by failing to consult on the impacts of horseshoe crab harvesting on threatened species, *see* 16 U.S.C. § 1536(a)(2), and by failing to reinitiate consultation on the Cape Romain Comprehensive Conservation Plan ("CCP") after the red knot and loggerhead sea turtle were listed as threatened species, *see* 16 U.S.C. § 1536(a)(2).  It is on the basis of these five claims that Plaintiff seeks a preliminary injunction.

Since 2003, the Service has closed three islands in Cape Romain (Marsh Island, White Banks, and Sandy Point) annually from February 15 to September 15 to all boat landings due to these islands' importance to nesting birds.  *See* 50 C.F.R. § 26.34(mm)(1)(v) ("We close Marsh Island, White Banks, and Sandy Point to public entry from February 15 through September 15 to protect nesting birds.").  At some point after

7

learning that commercial horseshoe crab harvesting was occurring on Marsh Island despite its closure, the Service sought "cooperation" from the South Carolina Department of Natural Resources to keep commercial horseshoe crab harvesting (which occurs between April and June) from occurring on the closed islands. (*See* ECF No. 1-4 at 2.) Specifically, according to a memorandum prepared by Refuge Manager Sarah Dawsey ("Dawsey"), she and another federal wildlife officer met with individuals from the South Carolina Department of Natural Resources to discuss the "illegal entry and harvest on closed islands." (*Id.* at 4.) Dawsey's memorandum states that the participants at the meeting "were in agreement that any harvest on these islands would not be in compliance with refuge specific regulations." (*Id.*) Also according to Dawsey's memorandum, she later met with the Director of Marine Resources for the South Carolina Department of Natural Resources to "ask for help in addressing the conflict in regulations." (*Id.*) The harvesting permits issued by the South Carolina Department of Natural Resources specifically provide that harvesting is not allowed "in restricted areas designated by other entities of the State or Federal government," and it appears that both the State of South Carolina and the Service construe this limitation as prohibiting the collection of horseshoe crabs from the three closed islands. (*Id.* at 5.)

Of particular relevance to the matters before the Court, the Service has sent Joel Munn ("Munn"), one of the individuals allegedly engaged in commercial horseshoe crab harvesting in Cape Roman on behalf of Charles River Labs, letters specifically notifying him that he cannot harvest horseshoe crabs from the closed islands. In one letter, the Service states: "the collection of horseshoe crabs in Cape Romain Wildlife Refuge on Marsh Island and/or White Banks Islands, is in direct violation of refuge specific Federal Regulations as

8

it requires landing and collecting in the intertidal zone of the island." (ECF No. 1-4 at 8.) According to Dawsey's memorandum and this letter, Dawsey also spoke to Munn, explained the regulations, "offered an alternative collection site at the north end of Bulls Island," and "discussed the potential for a special use permit to utilize the Garris Landing facility after hours if needed for easier access to this harvest area." (*Id.* at 5, 10.) In fact, in May of 2014, the Service issued Munn a special use permit for "access to Garris Landing during closed hours." (ECF No. 1-9 at 2-3.) The permit provides that Munn "will not access closed areas of the refuge." (*Id.* at 6.)

Dawsey, on behalf of the Service, sent Munn another letter dated November 12, 2015, to clarify a statement made in the earlier letter regarding the red knot. (ECF No. 1-3.) This 2015 letter thanks Munn for his "cooperation in protecting" Marsh Island, and it states that Dawsey looks forward to assisting Munn "with permits for horseshoe crab collection in the future." (*Id.*)

On April 19, 2016, Dawsey sent Munn another letter ("the 2016 Letter") on behalf of the Service, and this letter provides in pertinent part:

> To fulfill Refuge purpose we are required to protect sensitive migratory bird nesting areas. To that end we close Marsh Island, White Banks, and Sandy Point to public entry from February 15 through September 15 regardless of tides–no anchoring and no foot traffic. All refuge islands are "Closed to Public Entry" or occupancy from 1 hour after legal sunset to 1 hour before legal sunrise, except during a scheduled refuge big game hunt.
>
> We want to emphasize that the remainder of the refuge, more than 66,000 acres of land and waters, are open year-round for you to access. We want to also emphasize that we have no interest in regulating navigation or commercial fishing conducted by lawful means on the Refuge. Our establishment of the temporary closure regulation described above is only a result of our mandate to fulfill the purpose of the refuge.
>
> Our offer remains to discuss a special use permit to utilize the Garris Landing

facility after hours if needed for easier access.

(ECF No. 1-5 at 2.)  It is this 2016 Letter that Plaintiff asserts "marked a shift from the Service's position compared to earlier statements in which the agency had allowed only a much narrower scope of harvesting activities in the Refuge."  (ECF No. 21 at 7.) Specifically, Plaintiff contends that the Service previously suggested an alternative collection site at the north end of Bulls Island, while the 2016 Letter "conclusively and dramatically expanded the harvest" to the entire Refuge aside from the three closed islands.  (ECF No. 21 at 8.)  Thus, Plaintiff asserts that the 2016 Letter constitutes final agency action reviewable under the Administrative Procedure Act and/or the ESA.

## STANDARDS OF REVIEW

### I.    Rule 12(b)(1)

A motion for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the fundamental question of whether the Court has jurisdiction to adjudicate the matter before it.  In determining whether subject matter jurisdiction exists, the Court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). The plaintiff bears the burden of proof on questions of subject matter jurisdiction.  *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

### II.    Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) examines

the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id*. When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Supreme Court has explained that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 678.

## III.    **Rule 12(c)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." Ultimately, "a defendant may not prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would permit recovery for the plaintiff." *BET Plant Servs., Inc. v. W.D. Robinson Elec. Co.*, 941 F. Supp. 54, 55 (D.S.C. 1996).

"[A] Rule 12(c) motion for judgment on the pleadings is decided under the same standard as a motion to dismiss under Rule 12(b)(6)." *Deutsche Bank Nat'l Trust Co. v. IRS*, 361 F. App'x 527, 529 (4th Cir. 2010); *see Burbach Broad. Co. v. Elkins Radio*, 278 F.3d 401, 405 (4th Cir. 2002). Thus, to survive a motion for judgment on the pleadings, the

complaint must contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing the complaint, the Court accepts all well-pleaded allegations as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). However, the Court "need not accept allegations that 'contradict matters properly subject to judicial notice or [by] exhibit.' " *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006).

## IV. Rule 20

Federal Rule of Civil Procedure 20 provides for the permissive joinder of parties and indicates that persons may be joined as Defendants if:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). Rule 20 gives courts broad discretion regarding the permissive joinder of parties, and it "should be construed in light of its purpose, which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.' " *Saval v. BL, Ltd.*, 710 F.2d 1027, 1031 (4th Cir.1983) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir.1974)).

## V. Rule 24

Federal Rule of Civil Procedure 24(a) provides for intervention of right and states that the court "must permit anyone to intervene" who makes a timely motion and:

12

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  Next, Rule 24(b) provides for permissive intervention as follows:

(1) In General.  On timely motion, the court may permit anyone to intervene who:

(A) is given a conditional right to intervene by a federal statute; or

(B) has a claim or defense that shares with the main action a common question of law or fact.

(2) By a Government Officer or Agency.  On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

(A) a statute or executive order administered by the officer or agency; or

(B) any regulation, order, requirement, or agreement issued or made under the statute or executive order.

(3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(b).  For either type of intervention, the motion must be timely.  *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014).  When determining the timeliness of a motion to intervene, "a trial court in this Circuit is obliged to assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion."  *Id.*

## VI.     Rule 65

Federal Rule of Civil Procedure 65 establishes the procedure for federal courts to

13

grant preliminary injunctions. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The Supreme Court has stressed that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. "To obtain a preliminary injunction under the *Winter* test, a movant must make a 'clear showing' of [the] four requirements." *Alkebulanyahh v. Nettles*, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated on other grounds*, 559 U.S. 1089 (2010), *and adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C., 607 F.3d 355* (4th Cir. 2010); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) ("*Winter* thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits.") (internal quotation marks omitted).

## DISCUSSION

### I.    The Service's Motion to Dismiss Pursuant to Rules 12(b)(1) and (6)

In its motion to dismiss, the Service first makes a "facial" challenge to the Court's jurisdiction over Plaintiff's fourth, fifth, and sixth causes of action pursuant to the ESA. The ESA allows an entity to file a civil suit to enjoin the United States and any other governmental agency (to the extent permitted by the Eleventh Amendment to the United

14

States Constitution) "who is alleged to be in violation of any provision of this chapter or regulation." 16 U.S.C. § 1540(g)(1)(A). In addition, pursuant to this provision of the ESA: "The District Courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty . . . ." *Id.* § 1540(g)(1).

In its motion, the Service asserts that because it does not authorize horseshoe crab harvesting within the Refuge, it has no duty under Section 7 of the ESA, and that Plaintiff has alleged no "action" or "affirmative agency action" that triggers Section 7(a)(2) consultation requirements (in connection with Plaintiff's fourth cause of action). As to Plaintiff's fifth cause of action, the Service asserts that Plaintiff's claim that the Service failed to reinitiate consultation on the CCP after designating the loggerhead sea turtles within the Refuge as a distinct population segment ("DPS") runs afoul of the six-year statute of limitations. The Service admits that Plaintiff's claim that the Service failed to reinitiate consultation on the CCP after the listing of the red knot (which occurred in 2015) is timely but otherwise asserts that Plaintiff's fifth cause of action fails to state a claim. As to Plaintiff's sixth cause of action, the Service asserts that Plaintiff's factual allegations fail to state a plausible claim that the Service has caused a "taking" of the red knot.

In addition to seeking dismissal of Plaintiff's ESA claims, the Service asserts in its motion that the Court lacks jurisdiction over Plaintiff's seventh cause of action under the MBTA, and that Plaintiff fails to state a claim under the MBTA because:

(1) Plaintiff does not allege facts sufficient to establish standing under the MBTA; (2) Plaintiff has failed to allege that the Service's "authorization" of horseshoe crab harvesting constitutes a "final agency action" that is cognizable under the Administrative Procedure Act's ("APA") judicial review provision; and (3) Plaintiff has failed to allege facts to support a theory of

15

"take" under the regulations promulgated by the Secretary that interpret the scope of the MBTA.

(ECF No. 16 at 23.)

Finally, the Service seeks dismissal of Plaintiff's first, second, and third claims under the Refuge Improvement Act, asserting that Plaintiff ignores the fact that the Service does not have authority over the authorization of commercial horseshoe crab harvesting due to the terms of the 1991 Lease.

In response, Plaintiff asserts that the Service's motion miscontrues the final agency action at issue, and Plaintiff states: "Though it is correct that South Carolina issues generalized statewide permits governing horseshoe crab harvesting, the Refuge Act grants the Service concurrent authority–and the obligation–to regulate commercial activity in the Refuge to ensure its compatibility with Refuge purposes." (ECF No. 21 at 5.) Plaintiff asserts that the Service even acknowledges this in its motion by admitting that it "may limit, and indeed has limited, the *scope* of . . . commercial fishing activity" in the Refuge. (ECF No. 16-1 at 29 (emphasis in original).) Plaintiff then asserts that the Service exercised its authority to limit the scope of commercial fishing activity in 2016 when, for the first time, it opened nearly the entire Refuge to Munn for the commercial harvesting of horseshoe crabs. Thus, Plaintiff asserts that the 2016 Letter fits squarely within the definition of "final agency action" for purposes of the APA and under the two-part test articulated in *Bennett v. Spear*, 520 U.S. 154 (1997). In all, Plaintiff claims that its complaint sufficiently alleges that the Service has authorized the use of a national wildlife refuge for commercial purposes without complying with the specific mandates of the Refuge Improvement Act, the ESA, or the MBTA, and Plaintiff asks the Court to deny the Service's motion to dismiss.

After a thorough review of the parties' briefs and the applicable law, the Court is not convinced by the Service's arguments at this time. While many of the Service's arguments may be appropriate for consideration on the merits, at this stage (and as explained in greater detail in the Court's analysis of Plaintiff's motion for preliminary injunction), the Court is satisfied both that it has jurisdiction over the claims presented in Plaintiff's complaint and that Plaintiff's complaint contains sufficient factual matter, which is accepted as true for purposes of the Service's motion to dismiss, to state plausible claims for relief. Accordingly, the Court denies the Service's motion to dismiss.

**II.     Charles River Labs' Motion for Judgment on the Pleadings**

In its motion for judgment on the pleadings, Charles River Labs asserts that Plaintiff does not have standing to bring its claims and that the Court does not have jurisdiction of Plaintiff's first three claims pursuant to the Refuge Improvement Act because the Service did not take any final agency action authorizing the horseshoe crab harvesting. Charles River Labs also asserts that Plaintiff has not identified any affirmative action that would subject the Service to Section 7's consultation requirements (with respect to claim four), and that the Service was not required to reinitiate consultation on the 2010 CCP (with respect to claim five). As to claim six, Charles River Labs asserts that Plaintiff has failed to allege a "take" or proximate causation to state a claim under Section 9 of the ESA. Finally, Charles River Labs asserts that the MBTA cannot be enforced against the Service by Plaintiff.

In response, Plaintiff first asserts that Charles River Labs' motion is procedurally improper because a motion for judgment on the pleadings cannot be filed until the pleadings are closed, which will not happen until the Service files an answer following

17

resolution of its motion to dismiss.  In addition, Plaintiff asserts that Charles River Labs'

motion relies on two false premises: first, that the Service has taken no action to open the

Refuge to commercial activities associated with horseshoe crab harvesting, and, second,

that due to the terms of the 1991 Lease the Service lacks any authority whatsoever to

regulate such commercial activities to protect migratory birds and other species in the

Refuge.

After review, the Court agrees with Plaintiff that Charles River Labs' motion is

premature.  Although Charles River Labs urges the Court to overlook the fact that the

pleadings are not closed under the unique circumstances of this case (where the Service

had not yet answered when Charles River Labs intervened), the Court declines to do so

at this time.  Instead, the Court denies Charles River Labs' motion without prejudice, and

Charles River Labs may refile its motion at an appropriate time if it chooses to do so.[4]

## III.    Plaintiff's Motion for Preliminary Injunction

As previously explained, Plaintiff seeks a preliminary injunction in connection with

its first five causes of action.  To obtain a preliminary injunction, Plaintiff must make a clear

showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm

in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and

(4) that an injunction is in the public interest.  *See Winter*, 555 U.S. at 20.

---

[4]  The Court notes for practical purposes (as it indicated at the hearing on Plaintiff's motion for preliminary injunction) that it is "not convinced at all by Charles River Labs' arguments that the Service has absolutely no authority to regulate any aspect of the horseshoe crab harvest in the Cape Romain Refuge based on the 1991[L]ease, which reserves to the state of South Carolina the right to authorize certain fishing activities." (ECF No. 45 at 4.)  As the Court further explained at the hearing, Charles River Labs' argument is contradicted by the behavior of the State and the Service (as they apparently agree that the Service can at least regulate *the scope* of the commercial horseshoe crab harvesting and in fact has done so by preventing the harvest on three closed islands), and the 1991 Lease does not state that it reserves to the State of South Carolina exclusive, absolute, or unfettered authority to regulate all aspects of commercial fishing.

### A.    Likelihood of Success on the Merits

First, the Court must determine whether Plaintiff has made a "'clear showing' that it is likely to succeed on the merits of at least one of its claims at trial." *Handsome Brook Farm, LLC v. Human Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016) (citation omitted), *aff'd*, 700 F. App'x 251 (4th Cir. 2017). The first three claims arise under the Refuge Improvement Act, and claims four and five arise under the Endangered Species Act.

The Property Clause of the United States Constitution grants Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Congress tasked the Service with the administration and management of the National Wildlife Refuge System under the Refuge Improvement Act, the mission of which is to regulate the National Wildlife Refuge System for the purposes of "[conserving, managing, and restoring] fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). And Section (b)(5) authorizes the Service to "issue regulations to carry out the Act." 16 U.S.C. § 668dd(b)(5).

Pursuant to this authority, the Service promulgated a series of regulations found at C.F.R. § T. 50, Ch. I, Subch. C, Pt. 25, et. seq. As a general matter, these regulations:

> apply to areas of land and water held by the United States in fee title and to property interests in such land and water in less than fee, including but not limited to easements. *For areas held in less than fee, the regulations . . . apply only to the extent that the property interest held by the United States may be affected.*

50 C.F.R. § 25.11 (emphasis added).

In its first cause of action, Plaintiff alleges that the Service violated the Refuge

Improvement Act by failing to conduct a compatibility determination before it issued the 2016 Letter allegedly expanding the scope of commercial horseshoe crab harvesting to all but three islands in Cape Romain.  Pursuant to 16 U.S.C. § 668dd(d)(1)(A), the Service may "permit the use of any area within the System for any purpose . . . whenever [it] determines that such uses are compatible with the major purposes for which such areas were established."  The requirement to perform a compatibility determination applies whenever the Service "initiate[s] or permit[s] a new use of a refuge or expand[s], renew[s], or extend[s] an existing use of a refuge," 16 U.S.C. § 668dd(d)(3)(A)(i); *see also* 50 C.F.R. § 26.41(a).  For a use to be "compatible" it must be "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the [Service], will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge."  16 U.S.C. § 668ee(1).

Here, it does not appear that horseshoe crab harvesting is a "new use" of Cape Romain; thus, the question is whether the 2016 Letter *expanded, renewed, or extended* an existing use of Cape Romain.  The Service argues that, in accordance with the terms of the 1991 Lease, the State of South Carolina (and not the Service) previously authorized horseshoe crab harvesting in all areas of the Refuge other than the three islands deemed "restricted areas," and that the 2016 Letter, when read in such context, merely describes the authorization already provided by the State of South Carolina to Munn.

After consideration, the Court finds it unclear based on the current record whether the 2016 Letter effectively expanded, renewed, or extended an existing use of the Refuge. Accordingly, the Court finds that Plaintiff has not made a clear showing at this time that it is likely to succeed on the merits of its first claim.

20

In its second claim, however, Plaintiff alleges that the Service violated the Refuge Improvement Act by failing to authorize the commercial horseshoe crab harvesting by special permit. Contrary to the Court's finding with respect to Plaintiff's first claim, the Court finds that Plaintiff has made a clear showing of a likelihood of success on its second claim.

Under the regulations pertaining to the Refuge Improvement Act, "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." 50 C.F.R. § 27.97. Plaintiff contends that the Service violated this regulation by failing to require Munn to obtain a special permit authorizing the commercial enterprise at issue. In contrast, the Service argues that the United States' property interest in the lands subject to the 1991 Lease does not permit it to "authorize" commercial horseshoe crab harvesting by special permit because the 1991 Lease specifically reserved to the State of South Carolina the right to authorize such activity. For the following reasons, the Court is not convinced by Defendant's argument that the 1991 Lease prevents it from complying with 50 C.F.R. § 27.97.

First, although the 1991 Lease is "subject to [ ] [t]he right of the State of South Carolina to authorize the taking of shellfish, finfish, and other salt water species within the refuge boundary," the 1991 Lease does not provide that South Carolina's right is exclusive or absolute. (ECF No. 1-1.) In fact, it is clear from the parties' behavior that South Carolina's authority under the 1991 Lease is not unfettered, as even the Service admits that it "may limit, and indeed has limited, the *scope* of this authorization for commercial fishing activity on the leased portions of the Refuge." (ECF No. 16 at 29 (emphasis in original).) Stated plainly, the Service cannot have it both ways–asserting on the one hand that it has no authority but on the other hand that it has some authority. Thus, the mere

fact that the State has the authority to issue a permit authorizing fishing in the first instance (something everyone agrees about) does not mean that the Service consequently has no concurrent authority to regulate the time, place, and manner of a commercial enterprise to preserve the Refuge's purpose as a sanctuary for migratory birds and endangered and threatened species.  In other words, the 1991 Lease does not establish a stovepiped system wherein the State and the Service remain in separate corners completely isolated from one another, but rather, it envisions a collaborative relationship where both entities respect the authority of the other and work in conjunction to achieve the mutually desirable goal of preserving the Refuge.[5]

As Judge Norton explained in *Livingson v. United States*, the 1991 Lease "is not the only source of the [Service's] authority to regulate the Refuge."  No. 2:15-cv-564-DCN, 2016 WL 1274013, *3 (D.S.C. March 31, 2016).  As previously explained, Congress tasked the Service with the management of the National Wildlife Refuge System under the Refuge Improvement Act, and Section (b)(5) of that Act permits the Service to "issue regulations to carry out the Act."  16 U.S.C. § 668dd(b)(5).  For areas held in less than fee, "the regulations . . . apply only to the extent that the property interest held by the United States *may be affected*."  50 C.F.R. § 25.11 (emphasis added).  The regulation at issue in Plaintiff's second cause of action, 50 C.F.R. § 27.97, plainly states that "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit."  Although the 1991 Lease speaks to the State's ability to

---

[5] Additionally, the Court notes that concurrent with South Carolina's right to "authorize the taking of shellfish, finfish, and other salt water species," the Service only "allow[s]" sport fishing "on designated areas of [the Refuge] subject to [certain] conditions," and the same is true of "surf fishing."  50 C.F.R. § 32.59(a)(4). (ECF No. 1-2 at 160-61.)

2:20-cv-03657-BHH     Date Filed 05/12/21     Entry Number 55     Page 23 of 29

authorize fishing activity, it does not speak to the specific issue of authorizing a commercial enterprise. Thus, recognizing the existence of the State's authority under the 1991 Lease does not invalidate the Service's regulatory authority. Here, the Service has not shown that the commercial enterprise at issue *cannot possibly affect* the property interest held by the United States, and the plain language of § 27.97 would appear to indicate that the commercial enterprise falls within the scope of the such authority. *See Livingson,* 2016 WL 1274013, *4-*5 (stating that recognizing the plaintiff's easement rights did not invalidate the Service's regulatory authority and also analyzing cases addressing the Service's authority under § 27.97 to regulate activities occurring on non-federal property).[6] In other words, the Court finds that the fact that South Carolina can authorize certain fishing activities (whether commercial or not) does not override the Service's independent responsibilities and duties under the Refuge Improvement Act.

Here, the Service has not issued a special permit for the commercial enterprise of horseshoe crab harvesting, and regardless of whether the 2016 Letter constitutes final agency action, 5 U.S.C. § 706(1) allows courts to "compel agency action unlawfully withheld or unreasonably delayed." Thus, the Court finds that Plaintiff has made a clear showing of a likelihood of success on the merits as to its second claim, and the Court need not determine at this time Plaintiff's likelihood of success on any of its other claims.

---

[6] In *Livingson*, the parties filed a motion for reconsideration, and Judge Norton ultimately denied the motion. *See Livingson v. United States*, No. 2:15-cv-564-DCN (D.S.C. Dec. 2016). In his order, Judge Norton remarked that "the power to regulate commercial fishing was reserved [to the State] through a separate clause which spoke directly in terms of regulatory authority, not property rights." *Id.* n. 6. However, this statement does not dictate a different result in this case for the practical reason that, in *Livingson*, the controversy did not involve commercial fishing or shellfishing, and Judge Norton explained that "it was unnecessary to decide the scope of [the Service's] regulatory authority over commercial fishing or shellfishing to decide the issue before [the court]." *Id.* at *6; see *also* ECF No. 45 at 16.

**B.    Likelihood of Irreparable Harm**

In addition to showing a likelihood of success on the merits, a party seeking a preliminary injunction must make a clear showing that it is likely to be irreparably harmed in the absence of preliminary relief.  Here, Plaintiff asserts that its members are likely to suffer irreparable harm to their interests in enjoying the Refuge, including viewing the threatened red knot species, if this year's harvest of horseshoe crabs is not enjoined. Plaintiff also asserts that red knots in Cape Romain will be irreparably harmed because they rely on the horseshoe crabs' nutrient-rich eggs as a critical food source for their northward migration, and the harvesting at issue is reducing and/or eliminating the critical food source.

Here, Plaintiff has made a clear showing that the commercial harvesting of horseshoe crabs causes the deaths of horseshoe crabs and results in a reduced number of horseshoe crab eggs available for the threatened red knot.  Due to the nature of the environmental injuries at issue and their likelihood of occurrence in the absence of preliminary injunctive relief, the Court finds that Plaintiff has made a clear showing of irreparable harm.  *See* A*moco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (explaining that environmental injuries are irreparable because they "are not ownership interests in property susceptible to monetary valuation").

24

**C.     The Balance of Equities and the Public Interest**

Next, a party seeking a preliminary injunction also must show that the balance of equities tips in its favor and that injunctive relief is in the public's interest.  Because a listed species is at issue, Plaintiff asserts that the balance of equities tips heavily in its favor. Plaintiff also asserts that the Court should ignore Charles River Lab's claim that it will be irreparably harmed if the Court enjoins the harvest because Charles River Labs does not come to court with "clean hands" insofar as its agent has knowingly harvested crabs illegally in recent years on the closed islands.  Plaintiff also asserts that the public interest in protecting a listed species trumps Charles River Labs' interest to one supply of horseshoe crabs in a wildlife refuge, particularly where the company can obtain the horseshoe crabs elsewhere or use a synthetic alternative.

In response, the Service asserts that an injunction will hamper its ability to make management decisions, and Charles River Labs asserts that an injunction is not in the public interest because the LAL from the horseshoe crabs protects patient safety in connection with medicines and vaccines.

After consideration, the Court finds that Plaintiff has established that the balance of equities and the public interest weigh in favor of issuing a preliminary injunction.  *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 806 (E.D.N.C. 2016) (quotations, citations, and alterations omitted) ("Indeed, the equitable scales are always tipped in favor of the endangered or threatened species, and the balance of hardships and the public interest tips heavily in favor of protected species.").  First, because endangered and threatened species are at issue, the Court agrees that the equitable scales tip in their favor. Second, Congress has tasked the Service with the management of wildlife refuges, and the

25

public certainly has an interest in the Service complying with the applicable regulations. Lastly, as a practical matter, the Court notes that the relief granted in this order does not preclude Charles River Labs from (1) applying for a special permit from the Service or (2) seeking to harvest horseshoe crabs from other areas in South Carolina outside the Refuge.[7]

### D. Security Bond

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether Plaintiff should provide security in an amount sufficient to pay the costs and damages sustained by any party found to have been wrongfully enjoined. At the hearing, counsel for Charles River Labs suggested a security bond of $50,000.00, but in response to Plaintiff's proposed order, Charles River Labs requested a security bond of at least $2,300,000.00. On the other hand, Plaintiff argues that a nominal bond of $100 is appropriate because Plaintiff is a "public interest group[] who might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal." *Red Wolf Coal.*, 210 F. Supp. 3d at 807; *see also, e.g., Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999); *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (finding proper the district court's exercise of discretion in allowing environmental group to proceed without posting a bond, and emphasizing "special precautions to ensure access to the courts must be taken where Congress has provided

---

[7] The Court also recognizes that the effect of this preliminary injunction may be limited to the extent that Charles River Labs' contractors and/or agents have already begun harvesting horseshoe crabs during the current spawning season that began in late April or early May. While this preliminary injunction precludes the commercial harvesting of horseshoe crabs in the Refuge from this point forward in the absence of a special permit from the Service, the Court notes that the potential damages claimed by Charles River Labs in its filings would be reduced if Charles River Labs has already harvested horseshoe crabs this season.

for private enforcement of a statute"), *amended on other grounds by* 775 F.2d 998 (9th Cir.
1985); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, No. 13-2262
(JRT/LIB), 2015 WL 3887709, at *1 (D. Minn. June 24, 2015) ("Because the security
requirement is generally waived in public interest environmental litigation, the Court will
waive the requirement."), *aff'd*, 826 F.3d 1030 (8th Cir. 2016); *Landwatch v. Connaughton*,
905 F.Supp.2d 1192, 1198 (D. Or. 2012) ("It is well established that in public interest
environmental cases the plaintiff need not post bonds because of the potential chilling
effect on litigation to protect the environment and the public interest.  Federal courts have
consistently waived the bond requirement in public interest environmental litigation, or
required only a nominal bond.").

After review, and in light of the particular circumstances of this case, the Court finds
a nominal bond of $100.00 to be appropriate under the circumstances.

## IV.    The State's Motion to Intervene

In its motion, the State moves to intervene in this action as a matter of right, or in the
alternative, permissively, in accordance with Rule 24(a) and (b) of the Federal Rules of Civil
Procedure.  For either type of intervention, the motion must be timely.  *Alt v. EPA*, 758 F.3d
at 591.  When determining the timeliness of a motion to intervene, "a trial court in this
Circuit is obliged to assess three factors: first, how far the underlying suit has progressed;
second, the prejudice any resulting delay might cause the other parties; and third, why the
movant was tardy in filing its motion."  *Id.*

In response, Plaintiff asserts that the State's motion is not timely, but the Court
disagrees.  Here, Plaintiff filed suit in October but waited almost five months to file its
motion for preliminary injunction, and the Court does not find the State's consonant delay

27

untimely under the circumstances. The suit has not progressed very far (indeed, the Service has not yet filed an answer), and the delay will cause only minimal prejudice to Plaintiff insofar as the Court is not deferring its ruling on Plaintiff's motion for preliminary injunction as a result of the intervention. It is abundantly clear that the State has a direct and competing interest in this litigation, and the fact is that the Service cannot adequately represent the State's interest. Thus, the Court grants the State's motion to intervene in accordance with Rule 24(a) and (b) of the Federal Rules of Civil Procedure.

Next, the Court declines to defer its ruling on Plaintiff's motion for preliminary injunction until the State has had the opportunity to respond; nonetheless, the Court will permit the State to file a response to this matter within fourteen days from the date of this order, and the Court notes that its injunction is preliminary in nature and may be subject to amendment based on any potential issues raised by the State.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that the Service's motion to dismiss (ECF No. 16) is denied; Charles River Labs' motion for judgment on the pleadings (ECF No. 28) is denied without prejudice; Plaintiff's motion for preliminary injunction (ECF No. 29) is granted in part insofar as the commercial enterprise of harvesting horseshoe crabs on the Refuge is prohibited except as authorized by special permit in accordance with 50 C.F.R. § 27.97 and any other applicable statutes and regulations; the State's motion to intervene (ECF No. 46) is granted; and the State may file a response to this matter within fourteen days of the date of this order.

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Judge

May 12, 2021
Charleston, South Carolina